IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KAREN SHAFFER, on behalf of<br>BENTON SHAFFER,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>MICHAEL ASTRUE,<br>COMMISSIONER OF SOCIAL SECURITY,<br><br>　　　　　　Defendant. | )<br>)<br>)<br>)<br>)<br>) 　02:11-cv-476<br>)<br>)<br>)<br>)<br>) |

**MEMORANDUM OPINION AND ORDER OF COURT**

February 29, 2012

**I.     Introduction**

Karen Shaffer ("Plaintiff") brought this action pursuant to 42 U.S.C. § 1383(c)(3) on behalf of her minor son, Benton Shaffer, for judicial review of the final determination of the Commissioner of Social Security ("Commissioner"), which denied her application for child's supplemental security income ("SSI").

**II.    Background**

Benton Shaffer ("Benton") was born on June 7, 2000, making him a school-age child pursuant to 20 C.F.R. 416.926a(g)(2) at the time the Administrative Law Judge ("ALJ") issued his decision. Karen Shaffer, Benton's mother filed for child's SSI on behalf of Benton on February 21, 2008, in which she alleged that her son was disabled due to pervasive development disorder, anxiety disorder, behavior disorder, phonological disorder, and allergies as of his date of birth. (R. 105, 118).

A.     **Facts**

Benton Shaffer was eight (8) years old when the ALJ issued his decision. (R. 16). At the time, he lived at home with his mother and his twin brother, Randy. (R. 392). He began school in 2006, and his school records indicate that he had difficulty adjusting to kindergarten. (R. 392-404). For example, his kindergarten teacher, Mrs. Benke, reported that although he had good attendance and completed his homework, he lacked motivation and was "developmentally young." (R. 394). According to Mrs. Benke, Benton was prone to "tattling, bossing, [and] ignoring" when he interacted with peers. (R. 394). Near the end of Benton's first school year, an Individualized Education Program ("IEP") reevaluation report noted that he was irresponsible and unable to take care of his school supplies. It also noted that he could not work independently, was constantly in need of redirection, and was unable to complete tasks. (R. 394). Nonetheless, IQ testing showed Benton to be functioning within average range of intelligence. (R. 398).

On August 29, 2007, Benton underwent a diagnostic neurobehavioral evaluation performed by Amanda L. Pelphrey, Psy.D., a licensed psychologist at the Child Development Unit of Children's Hospital of Pittsburgh. She determined that Benton had a global assessment of functioning ("GAF") score of 60. (R. 267). Based on Benton's difficulty communicating and socializing and his defiant behaviors, Dr. Pelphrey diagnosed Pervasive Developmental Disorder ("PDD") Not Otherwise Specified, and anxiety disorder, not otherwise specified. (R. 267). As a result of the diagnosis, Benton's mother was given information about how to obtain comprehensive wraparound services. (R. 268).

On January 10, 2008, Benton was evaluated by Scott B. Roberts, M.A., a licensed psychologist, to determine his ongoing eligibility for wraparound services. (R. 271). Mr. Roberts recorded in his notes that Benton, then in the first grade, had shown "considerable progress" in his school performance and social skills after his mother placed him a separate classroom from his twin brother, with whom Benton had been playing almost exclusively. (R. 273-75). Mr. Roberts also noted that Benton's reading had improved as a result of a reading recovery program, and he was not demonstrating any significant behavioral problems. (R. 273). Benton also seemed to be enjoying playing with a new friend, and his mother told Mr. Roberts that her son was speaking more about his feelings instead of acting them out. (R. 273). On the other hand, tests revealed that Benton still had low frustration tolerance, organizational difficulties, mild issues with fine motor coordination, tactile defensiveness, and sensitivity to smells. (R. 273-74). Mr. Roberts diagnosed PDD, not otherwise specified (tentative diagnosis); anxiety, not otherwise specified; and phonological disorder. (R. 275). Further, he rated Benton's GAF at 55 and recommended that he continue to receive wraparound services, albeit with a reduction in the amount of time needed with a behavioral specialist. (R. 275).

One month later, Shwetha Kamath, M.A., OTR/L, performed a comprehensive occupational therapy evaluation. (R. 305). She noted that Benton was able to follow test directions well and sustain attention to tasks until completion. (R. 305). She also indicated, however, that Plaintiff was distracted by sounds. (R. 305). Tests showed that Benton's coping skills, motor planning, spatial awareness, gross and fine motor coordination, postural control, and social skills were all impacted by deficits in

processing and integrating sensory information. (R. 310). In view of that, Ms. Kamath recommended that Benton undergo weekly occupational therapy at a clinic with specialized sensory integration equipment. (R. 310).

On April 28, 2008, Benton's teacher completed an evaluation form with questions pertaining to the six domains of functioning. (R. 202). In it, she reported that in the domain of acquiring and using information, Benton had no problem comprehending oral instructions, understanding school and content vocabulary, reading and comprehending written material, comprehending and doing math problems, learning new material, and recalling and applying previously learned material. (R. 202). Benton's handwriting problems associated with his issues with fine motor skills, however, resulted in a "serious" problem with expressing ideas in writing. (R. 202). Under the domain attending and completing tasks, the teacher noted that Benton had no problem paying attention when spoken to directly, carrying out single-step instructions, or working at a reasonable pace/finishing on time. (R. 203). However, she noted that Benton had an "obvious" problem waiting to take turns, organizing his things, and changing activities. (R. 203). With respect to the domain of interacting and relating to others, Benton had no reported problems. He had a slight problem in all areas of functioning within the domain of "moving about and manipulating objects." (R. 205). Finally, Benton exhibited only "slight" problems under the domain caring for yourself.

Dr. Pelphrey reevaluated Benton on May 12, 2008 and reported that he had been doing well in the classroom. (R. 452). According to Dr. Pelphrey's notes, Benton's teacher had described him as energetic, task-oriented, and compassionate. (R. 453). That same teacher reported to Dr. Pelphrey that Benton listened very well, communicated

well, and had a good sense of humor. (R. 453). Dr. Pelphrey noted that Benton demonstrated improved participation as compared to his first evaluation. In addition to appearing less anxious and withdrawn, Benton had improved eye contact, reciprocal communication, and overall quality of rapport. (R. 454). Tests indicated mild deficiencies in developmental and behavioral skills, and as a result, Dr. Pelphrey rated Benton's GAF at 60, indicative of moderate limitations. (R. 456). While improving, Benton still had elevations in anxiety symptoms that continued to interfere with his behavioral functioning. (R. 456). Because Benton had shown progress in response to his current level of care, Dr. Pelphrey recommended ongoing services, with emphasis on structured social play experiences. (R. 456).

In May 2008, Benton participated in year-end standardized testing in school. (R. 583). He was at or above grade level in all areas except for vocabulary and language, in which he registered at a grade level of 1.6. (R. 583). Later that month, on May 21, 2008, Arlene Rattan, Ph.D., a state agency psychologist, reviewed Benton's records and opined that he had "less than marked" limitations in five of the six domains of functioning. (R. 368-69). According to Dr. Rattan, Benton had a "marked" limitation with respect to the domain of caring for yourself. (R. 369).

Three months later, Benton underwent a psychological evaluation to determine whether his behavioral health rehabilitation services were still necessary. (R. 477). Carole G. Stern, M.A., a licensed psychologist who performed the evaluation, noted that although Benton's social skills were improving, he continued to display a deficit; he was very impulsive and displayed boundary issues. (R. 479-80). In addition, he required prompting to stay on task. (R. 480). After the evaluation, Ms. Stern concluded that

despite Benton's progress, he still exhibited high energy, impulsivity, and difficulty staying focused. (R. 483). She further concluded that these problems, taken together, continued to interfere with his ability to interact with fellow students and with school functioning. (R. 483). Accordingly, she recommended that he continue services with a behavioral specialist, mobile therapy services, and therapeutic support staff. (R. 484).

Benton began second grade in August 2008, and throughout the school year, he received occupational therapy once or twice a week. (R. 617). Rose Hildebrand, Benton's occupational therapist, reported that during his therapy session, Benton responded well to core strengthening exercises. (R. 617). On August 28, 2008, Ms. Hildebrand made recommendations for the upcoming school year, which included a highly structured classroom environment, color-coding of class materials, the use of checklists and verbal and visual clues for changes in tasks, and daily exercises for posture control. (R. 617).

Benton's report card from the first quarter of second grade revealed that he was generally approaching or at grade level in all areas except for handwriting and applying spelling skills. (R. 582). Lauri Luba, his second grade teacher, also noted that he needed improvement in managing his time effectively and putting forth effort. (R. 582).

In a teacher questionnaire completed by Ms. Luba, it was noted that Benton had no "serious" problems in any of the six domains of functioning. (R. 241-45). Within the domain of acquiring and using information, Ms. Luba noted that Benton had no problems with reading comprehension, comprehending math problems, and learning new material. (R. 241). He had an "obvious" problem with expressing ideas in writing. (R. 241). With regard to attending and completing tasks, the teacher indicated that Benton had no

problem changing from one activity to another without being disruptive, but "obvious" problems focusing long enough to finish assigned tasks, refocusing on tasks when necessary, carrying out multi-step instructions, and organizing his own things or school materials. (R. 242). She also noted "slight" problems interacting with others. (R. 243). According to Ms. Luba, under the domain moving about and manipulating objects, Benton had no problems with regard to managing the pace of physical activities or tasks. (R. 244). He had "obvious" problems moving and manipulating things, showing a sense of his body's location and movement in space, and integrating sensory input with motor output. (R. 244). Within the domain caring for yourself, Benton had an "obvious" problem handling frustration appropriately. (R. 245).

Benton underwent three separate evaluations in December 2008. First, on December 8, 2008, Julie B. Harbert, an occupational therapist, opined that Benton had a "marked" limitation with regard to the domain of "moving about and manipulating objects." (R. 564). She found a moderate impairment with regard to the five other domains of functioning. (R. 563-65). The next day, Benton's pediatrician, whose name is illegible in the record, opined that Plaintiff had moderate impairments in all six domains of functioning. (R. 568-70). Finally, on December 10, 2008, Ms. Stern opined that Benton had marked impairments in the following domains of functioning: attending and completing tasks, interacting and relating to others, and caring for yourself. (R. 571-75). She also found moderate impairment with regard to acquiring and using information and "none to slight" impairment with regard to moving about and manipulating objects and health and physical well-being. (R. 574-75).

7

### B.     Procedural History

Karen Shaffer, Benton's mother, initially filed for SSI on behalf of Benton on February 21, 2008. (R. 13). The claim was denied on May 22, 2008, and Plaintiff filed a timely written request for hearing on June 11, 2008. (R. 13). An administrative hearing was held on November 20, 2008 before ALJ Richard D. Brady, at which Benton and his mother both appeared and testified. Also present was Barbara S. Manna, a non-attorney representative.

On November 20, 2009, the ALJ rendered an unfavorable decision to Plaintiff in which he found that while Benton had a number of severe impairments, he does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (R. 26). The ALJ's decision became the final decision of the Commissioner on February 16, 2011, when the Appeals Council, after reviewing additional evidence submitted by Plaintiff, denied her request to review the decision of the ALJ.

On April 22, 2011, Plaintiff, Karen Shaffer, filed a Complaint in this Court in which she seeks judicial review of the decision of the ALJ. The parties have filed cross-motions for summary judgment. (Document Nos. 6 and 8). Plaintiff argues that the ALJ erred by (1) failing to find that Benton meets the requirements of Listing 112.02; and (2) improperly weighing the opinion of a treating psychologist and engaging in his own medical diagnosis. On the other hand, the Commissioner contends that the decision of the ALJ should be affirmed as it is supported by substantial evidence. The Court agrees with the Commissioner and will therefore grant the motion for summary judgment filed by the Commissioner and deny the motion for summary judgment filed by Plaintiff.

**III.    Legal Analysis**

   **A.    <u>Standard of Review</u>**

The Act limits judicial review of disability claims to the Commissioner's final decision.  42 U.S.C. §§ 405(g)/1383(c)(3).  If the Commissioner's finding is supported by substantial evidence, it is conclusive and must be affirmed by the Court.  42 U.S.C. § 405(g); *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005).  The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389 (1971); *see Capato v. Comm'r of Social Sec.*, 631 F.3d 626, 628 (3d Cir. 2010) (internal citation omitted).  It consists of more than a scintilla of evidence, but less than a preponderance. *Thomas v. Comm'r of Social Sec.*, 625 F.3d 798 (3d Cir. 2010).

   Children seeking SSI benefits must qualify as being disabled under the Act.  *Sykes v. Barnhart*, 84 Fed. Appx. 210, 212 (3d Cir. 2003).  Disability is established when the claimant demonstrates "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(C)(i).

   When resolving the issue of whether a claimant under the age of 18 is or is not disabled, the Commissioner utilizes a three-step sequential evaluation, under which the ALJ will consider:  (1) whether the child is working; (2) whether the child has a medically determinable  "severe" impairment or combination of impairments; and (3) whether the child's impairment or combination of impairments meets, medically equals, or functionally equals the severity of an impairment in the listings.  20 C.F.R. §

416.924(a) - (d). In order to determine whether the child's impairment(s) functionally equal the listings, "[the] child's functional limitations will be evaluated in the following six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for herself or himself; and (6) health and physical well-being." *Hairston ex rel. Rowe v. Barnhart*, 54 Fed. Appx. 41, 43 (3d Cir. 2002) (citing 20 C.F.R. § 416.926a(b)(1)(i)-(vi)). An impairment or combination of impairments functionally equals a listed impairment if a child shows "marked" limitations in two domains of functioning or "extreme" limitation in one domain. *Richardson v. Barnhart*, 136 Fed. Appx. 461, 466 (3d. Cir. 2005). When the Commissioner considers whether a child has marked or extreme limitations in any domain, he examines the evidence in the record on how the child's functioning is limited because of the child's impairments and "compare[s] [the child's] functioning to the typical functioning of children [his] age who do not have impairments." 20 C.F.R. § 416.926a(f)(1).

A marked limitation exists when an impairment interferes seriously with the child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2)(i). "Marked limitation also means a limitation that is more than moderate but less than extreme." 20 C.F.R. § 416.926a(e)(2)(i) (internal quotation marks omitted). An extreme limitation exists when an impairment "interferes very seriously with [the] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(I). "Extreme limitation also means a limitation that is more than marked." *Id.* (internal quotation marks omitted).

**B.     The ALJ's Decision**

In his decision, the ALJ followed the three-step sequential evaluation process and concluded that Benton was not "disabled" within the meaning of the Act. (R. 13–26). Benton was born June 7, 2000 and was defined as a "school-age child" as of the date of his alleged disability onset as well as the date of the decision of the ALJ. (R. 16). At step one, the ALJ determined that Benton had not engaged in substantial gainful activity at any time relevant to his decision. (R. 16). At step two, the ALJ found Benton to be suffering from pervasive developmental disorder, not otherwise specified; anxiety disorder, not otherwise specified; accommodative estropia with convergence insufficiency; and allergic rhinitis, mild. (R. 16). At step three, the ALJ concluded that Benton did not have any medically determinable impairments, whether considered individually or in combination, that had presented symptoms sufficient to meet or medically equal the severity of an impairment for any of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1; 20 C.F.R. §§ 416.924, 416.925, 416.926. (R. 16).

In considering whether Benton had an impairment or combination of impairments that functionally equaled the listings, the ALJ determined that Benton had less than marked limitations in acquiring and using information; attending and completing tasks; interacting and relating with others; moving and manipulating objects, caring for yourself; and health and physical well-being (R. 22-26). Therefore, the ALJ concluded that Benton had not been disabled since June 7, 2000, Plaintiff's alleged disability onset date. (R. 26).

**C.     Discussion**

As set forth in the Act and applicable case law, this Court may not undertake a de novo review of the Commissioner's decision or re-weigh the evidence of record. *Monsour Medical Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986), *cert. denied*, 482 U.S. 905 (1987). The Court must simply review the findings and conclusions of the ALJ to determine whether they are supported by substantial evidence. 42 U.S.C. § 405(g); *Schaudeck v. Comm'r of Social Sec.*, 181 F.3d 429, 431 (3d Cir. 1999).

In support of her Motion for Summary Judgment, Plaintiff alleges two (2) errors by the ALJ. First, she argues that the ALJ erroneously found that Benton did not meet the requirements of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. Second, she argues that the ALJ improperly weighed the opinions of one of her son's treating psychologists, and engaged in his own medical diagnosis. The Court will address each of these claims *seriatim*.

1.  *The ALJ's decision that Benton did not meet an impairment in the listings is supported by substantial evidence.*

Karen Shaffer first challenges the ALJ's decision at step three of the sequential evaluation that Benton failed to meet the requirements of Listing 112.02 (Organic Mental Disorders), arguing that the decision is not supported by substantial evidence. Part "A" of Listing 112.02 requires the presence and/or persistence of certain medically documented findings, such as developmental arrest, disturbance in personality and mood, emotional lability, impairment of cognitive function, and disturbance of concentration, attention, or judgment. 20 C.F.R. § 404, subpt. P, app. 1. Part "B" of the Listing applies specifically to children ages 3 to 18 and requires that the relevant medical findings result in at least two of the following:

> a) Marked impairment in age-appropriate cognitive/communicative function, documented by medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized psychological tests . . . .
>
> b) Marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or
>
> c) Marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, appropriate standardized tests; or
>
> d) Marked difficulties in maintaining concentration, persistence, or pace.

*Id.*

According to Plaintiff, Benton's "medical records, school reports, physical and mental evaluations, and difficulties despite on-going intensive treatment all support a finding of disability under this listing." Pl.'s Br. in Supp. of Mot. for Summ. J. at 5 (Document No. 7). In support of this argument, she contends, *inter alia*, that Benton had difficulties adjusting to school, evidenced by the fact that he was forced to repeat kindergarten; struggled with physical developmental delays; had elevated anxiety; and was incapable of maintaining appropriate focus and concentration. *Id.* at 5-8.

At step three of the sequential evaluation, the United States Court of Appeals for the Third Circuit "requires the ALJ to set forth the reasons for his decision" with more than mere conclusory statements that a condition does not match a listed impairment. *Burnett v. Comm'r of Social Sec. Admin.*, 220 F.3d 112, 119 (3d Cir. 2000). Instead, the ALJ must discuss all of the relevant evidence and sufficiently explain his reasoning so as

to allow a meaningful judicial review of his decision. *Diaz v. Comm'r of Social Sec.*, 577 F.3d 500, 504 (3d Cir. 2007). The ALJ need not, however, use "magic words" or follow a particular format in conducting his analysis. *Jones*, 364 F.3d at 505.

In reaching his decision, the ALJ methodically considered Benton's limitations with respect to the six domains of functioning based on the medical records, including the findings of Dr. Pelphrey, Mr. Roberts, Ms. Stern, Ms. Harbert, Ms. Kamath, the state agency psychologist, and Benton's pediatrician; the evaluation forms completed by Benton's teachers; the statements from Benton's family members; and other relevant evidence. (R. 16-26). In each of the six domains, the ALJ found that Benton was at least to some degree impaired. (R. 16). For example, with respect to acquiring and using information, the ALJ explained that a GAF of 60 indicates moderate impairment, which manifested itself only at home and not in school. (R. 22). In addition, he noted that the domain of attending and completing tasks was "probably the most affected domain, but still is moderately limited at most" because Benton "demonstrated work on a just below grade level in the first and second grade." (R. 23). Nonetheless, the ALJ explained that the evidence, considered as a whole, "simply does not support a finding that the claimant's impairments are extreme in any domain, nor in any two of those domains have they reached the level of a marked impairment at any time since February 21, 2008." (R. 17). Further, the ALJ expressly referred to Listing 112.02 and concluded that Benton's condition did not satisfy any of the criteria set forth in Part "B," as all of his limitations were less than marked. (R. 16).

Plaintiff takes issue with that conclusion, arguing that the record revealed an extreme limitation, or at least a marked limitation, in age-appropriate social functioning.

Pl.'s Br. in Supp. of Mot. for Summ. J. at 7-8 (Document No. 7).  Further, she argues that Benton's sensory problems and "other behaviors" reveal marked impairments, without specifying in which category of Part "B" those impairments fall.  *Id.* at 8.  The Court, however, finds that substantial evidence supports the ALJ's decision.

With respect to age-appropriate social functioning, the ALJ did not err in finding that Benton's limitations were less than marked.  Importantly, of all the medical and psychological professionals who evaluated Benton, the record reveals that only one, psychologist Carole Stern, reported that he had a marked limitation in the domain of interacting and relating to others. (R. 571-75).  As the ALJ noted, however, this opinion was inconsistent not only with the weight of the evidence, but also with Ms. Stern's prior assessment that Benton had a GAF of 55, which indicates only moderate impairment.  (R. 21, 484).  In fact, the record reveals that Benton's teachers, who spent five days a week with him in an academic setting, consistently indicated that at most he suffered only mild limitations interacting and relating to others.  (R. 23).  For example, in April 2008, Benton's first grade teacher noted that he had no problem in that domain, which included skills such as playing cooperatively and following rules.  (R. 204).  Likewise, his second grade teacher reported that he had only slight problems in some aspects of interacting and relating to others.  (R. 243).  Furthermore, while Dr. Pelphrey, the Children's Hospital of Pittsburgh psychologist who first evaluated Benton in August 2007, did recommend that Benton be provided with structured social play experiences, she also noted that Benton had been doing well in the classroom.  (R. 453-56).  In addition, after reevaluating him in May 2008, she reported that his reciprocal communication had improved, as had his

overall quality of rapport. (R. 454). Consistent with that finding, she assessed his GAF at 60, indicative of moderate impairments. (R. 454).

Moreover, although Benton's mother contends that his refusal to eat certain types of food and his inability to maintain appropriate focus and concentration support a finding of marked impairments, the Court does not agree. In fact, the record reveals that Benton performed at or just below grade level in most subjects in the first and second grades. In addition, after performing a comprehensive occupational therapy evaluation, Ms. Kamath noted that Benton was able to sustain attention to tasks and follow them through to completion. Similarly, Benton's occupational therapist noted that he demonstrated no frustration at new tasks and was accepting and implementing the therapist's suggestions. In view of these findings, the ALJ's determination that Benton did not have at least two marked limitations in functioning, as is required by Part "B" of Listing 112.02, is supported by substantial evidence.

    2.    *The ALJ properly weighed the opinion of psychologist Carole Stern.*

Karen Shaffer argues that the ALJ erred in affording little weight to the opinion of psychologist Carole Stern, who evaluated Benton in August 2008 and opined four months later that he had several marked impairments. She further argues that the ALJ improperly engaged in his own medical diagnosis, "picking and choosing" evidence that would support his ultimate conclusion. The United States Court of Appeals for the Third Circuit has explained that an ALJ should accord "treating [psychologists'] reports great weight, 'especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" *Brownawell v. Comm'r of Social Sec.*, 554 F.3d 352, 355 (3d Cir. 2008) (quoting *Morales v. Apfel*, 225

F.3d 310, 317 (3d Cir. 2000)); see 20 C.F.R. § 404.1527(d)(2) (providing that a treating physician's opinion should receive controlling weight when it is well-supported by medical evidence and consistent with the other substantial evidence in the record). However, although an ALJ may not draw speculative inferences from medical reports or base his decision on his own "credibility judgments, speculation, or lay opinion," he may reject a treating psychologist's opinion outright on the basis of conflicting evidence in the record. *Morales*, 225 F.3d at 317-18 (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999)). In doing so, an ALJ must at least consider all evidence that supports the treating psychologist's opinion and give some reason for discounting the evidence which he/she rejects. *Plummer*, 186 F.3d at 429.

In this case, the ALJ did just that, deciding not to give significant weight to the opinions of Ms. Stern because he found them inconsistent with the weight of the evidence. (R. 21). Specifically, he explained that Ms. Stern's findings were contradicted by the evaluation forms completed by Benton's teachers during the 2007-2008 and 2008-2009 school years. (R. 21). Moreover, as discussed above, the December 2008 findings were also inconsistent with Ms. Stern's prior assessment of Benton's condition. (R. 484).

Having considered Ms. Stern's opinions and explained his reason for rejecting them, the ALJ was "free to choose the medical opinion of one [psychological or medical professional] over that of another." *Diaz*, 577 F.3d at 505 (citing *Cotter v. Harris*, 642 F.2d 700, 705, *reh'g denied*, 650 F.2d 481 (3d Cir.1981)). Accordingly, his decision to grant significant weight to the opinions of the state agency psychologist; Benton's pediatrician, who opined that Benton had only moderate impairments in the six domains

of functioning; and Benton's occupational therapist, who reported that Benton was showing improvement, was not erroneous or contrary to law.

## IV. Conclusion

It is undeniable that Benton has a number of impairments, and this Court is sympathetic and aware of the challenges which Benton faces in his daily life, both at school and at home.  Under the applicable standards of review and the current state of the record, however, the Court must defer to the reasonable findings of the ALJ and his conclusion that Benton is not disabled within the meaning of the Social Security Act because he does not have an impairment or combination of impairments that meets or medically equals one of the impairments in 20 C.F.R. § 404, Subpart P, Appendix 1.

For these reasons, the Court will grant the Motion for Summary Judgment filed by the Commissioner and deny the Motion for Summary Judgment filed by Plaintiff.

An appropriate Order follows.

McVerry, J.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KAREN SHAFFER, on behalf of ) <br> BENTON K. SHAFFER, ) <br> ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> MICHAEL J. ASTRUE, ) <br> COMMISSIONER OF SOCIAL SECURITY, ) <br> ) <br> Defendant. ) | 02:11-cv-476 |

### ORDER OF COURT

**AND NOW**, this 29th day of February, 2012, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED**, **ADJUDGED, AND DECREED** that:

1. Plaintiff's motion for summary judgment is **DENIED**.

2. Defendant's motion for summary judgment is **GRANTED.**

3. The Clerk shall docket this case closed.


BY THE COURT:


s/Terrence F. McVerry
United States District Court Judge


cc:   Kelie C. Schneider, Esquire
      Email: kschneider@peircelaw.com

      Paul Kovac
      Assistant U.S. Attorney
      Email: paul.kovac@usdoj.gov